IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. HOWARD HOLZMACHER, Jr., and NORTH LANDING FIREWOOD & HAULING, INC., *Defendants*. | Civil Action No. 2:25-cv-00034-EWH-LRL |

**MEMORANDUM IN SUPPORT OF
UNOPPOSED MOTION TO HOLD CASE IN ABEYANCE**

The United States respectfully moves the Court to hold this matter in abeyance for 60 days, to and including July 14, 2025, to allow the Parties time to evaluate the potential impacts of pending administrative proceedings on this case. Defendants Howard Holzmacher, Jr., and North Landing Firewood & Hauling, Inc., do not oppose this motion. The grounds for the motion are set forth below:

1. This is a civil action against Defendants under Section 309 of the Clean Water Act. 33 U.S.C. § 1319. The United States alleges that Defendants discharged and are continuing to discharge pollutants to waters of the United States in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

2. On March 12, 2025, the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (the Corps) (collectively, the Agencies) issued a memorandum providing new guidance concerning the implementation of the "continuous surface connection" requirement for adjacent wetlands under the definition of "waters of the United

1

States." *See* Attach. 1. In the same memorandum, the Agencies announced that a notice will be published in the Federal Register to establish a rulemaking docket and to gather recommendations to assist the Agencies in further clarifying the definition of "waters of the United States." *Id.* at 5-6.

3. On March 24, 2025, the notice appeared in the Federal Register. 90 Fed. Reg. 13428 (Mar. 24, 2025), Attach. 2. The notice states that the Agencies will hold a series of at least six listening sessions to seek input on the scope of "continuous surface connection" among other issues. *Id.* at 13430-31. The Agencies accepted written comments from the public through the docket through April 23, 2025. *Id.* at 13430. In doing so, the Agencies "will seek to provide clear and transparent direction regarding the definition [of 'waters of the United States'] and will prioritize practical implementation approaches, provide for durability and stability, as well as for more effective and efficient jurisdictional determinations, permitting actions, and other actions consistent with relevant decisions of the Supreme Court." *Id.*

4. Based on these developments, the United States respectfully requests that the Court hold this case in abeyance while the Agencies' stakeholder input process moves forward. The Court should also direct the United States to file a status report at the conclusion of the abeyance to provide an update on the stakeholder input process and to propose further proceedings, as appropriate. The Court should additionally stay Defendants' current May 19, 2025 deadline to file a responsive pleading.

5. The Court has "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). In exercising its authority, the court must "weigh competing interests and maintain an even balance." *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936). This weighing requires the Court to "consider '(1) the length of

the requested stay; (2) the hardship or inequity that the movant would face in going forward with the litigation; (3) the injury that a stay would inflict upon the non-movant; and (4) whether a stay would simplify issues and promote judicial economy.'" *United States for Use of Precision Air Condition of Brevard, Inc. v. Cincinnati Ins. Co.*, 533 F. Supp. 3d 290 (E.D. Va. 2021) (quoting *Rajput v. Synchrony*, 221 F. Supp. 3d 607, 609-10 (M.D. Pa. 2016)).

6. The requested 60-day abeyance is of a limited duration, will not prejudice any of the Parties, and could simplify the issues before the Court and promote judicial economy. Good cause thus exists for the requested abeyance.

7. Counsel for the United States has conferred with counsel for Defendants. Defendants do not oppose our motion.

8. For the foregoing reasons, we respectfully request that the Court hold this case in abeyance for 60 days, to and including July 14, 2025, and direct the United States to file a status report at the conclusion of the abeyance to provide an update on the stakeholder input process and to propose further proceedings, as appropriate. A proposed order accompanies our motion.

Dated: May 15, 2025

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

ERIK S. SIEBERT
United States Attorney
Eastern District of Virginia

*/s/ Albert Lin*
Albert Lin, Ca. Bar No. 338253
Trial Attorney
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-2741
Fax: (202) 514-8865
albert.lin@usdoj.gov

*/s/ Kent P. Porter*
Kent P. Porter, VSB No. 22853
Supervisory Assistant U.S. Attorney
Office of the United States Attorney
Eastern District of Virginia
101 W. Main Street, Suite 8000
Norfolk, Va. 23510-1671
Tel: (757) 441-6331
Fax: (757) 441-6689
kent.porter@usdoj.gov

*Attorneys for the United States of America*

OF COUNSEL:

LAUREN ZARRILLO
Assistant Regional Counsel
United States Environmental Protection
Agency Region 3
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103

4

# Attachment 1




**MEMORANDUM TO THE FIELD BETWEEN
THE U.S. DEPARTMENT OF THE ARMY, U.S. ARMY CORPS OF ENGINEERS
AND THE U.S. ENVIRONMENTAL PROTECTION AGENCY CONCERNING THE PROPER IMPLEMENTATION
OF "CONTINUOUS SURFACE CONNECTION" UNDER THE DEFINITION OF "WATERS OF THE UNITED
STATES" UNDER THE CLEAN WATER ACT**

March 12, 2025

**PURPOSE**

This memorandum provides guidance to the U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency regarding the implementation of the definition of "waters of the United States" under both regulatory regimes currently operative across the country: the "Revised Definition of 'Waters of the United States,'" as amended by the final rule "Revised Definition of 'Waters of the United States'; Conforming" (the amended 2023 rule; 40 C.F.R. 120.2 and 33 C.F.R. 328.3) and the "pre-2015 regulatory regime"[1] consistent with the Supreme Court's decision in *Sackett v. Environmental Protection Agency*, 598 U.S. 651 (2023).[2]

This memorandum is being issued in response to requests for clarification on the implementation of the Federal Water Pollution Control Act, also known as the Clean Water Act, with respect to adjacent wetlands in light of the Supreme Court's decision in *Sackett v. Environmental Protection Agency*. Specifically, the preamble to the 2023 Rule ("Revised Definition of 'Waters of the United States,'" 88 FR 3004 (January 18, 2023)) and the preamble to the conforming rule ("Revised Definition of 'Waters of the United States'; Conforming," 88 FR 61964, September 8, 2023) did not include adequate direction or guidance on the meaning of the "continuous surface connection" requirement, and the agencies' case-specific policy memoranda issued post-*Sackett* neither provided national guidance on the topic nor clear and transparent direction for the public or the agencies. The case-specific policy memoranda also contain conclusions which are inconsistent with the discussion of "continuous surface connection" as described in the pre-2015 regulatory regime guidance documents and the *Sackett* decision. In order to provide national consistency and eliminate confusion about the scope of "adjacent wetlands," and

---

[1] The "pre-2015 regulatory regime" refers to the agencies' definition of "waters of the United States" set forth in pre-2015 Corps and EPA regulations (the Corps' 1986 regulations and the EPA's 1988 regulations, inclusive of the exclusion for prior converted cropland, which both agencies added in 1993), implemented consistent with relevant case law, including *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), and *Rapanos v. United States*, 547 U.S. 715 (2006). It also refers to longstanding practice, as informed by applicable guidance, including "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States*" (Dec. 2, 2008) (2008 *Rapanos* Guidance), available at https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf. Additionally, the agencies interpret the phrase "waters of the United States" consistent with the Supreme Court's decision in *Sackett v. Environmental Protection Agency*.

[2] For more information about the operative definition of "waters of the United States" for specific geographic areas in light of litigation, please visit https://www.epa.gov/wotus/definition-waters-united-states-rule-status-and-litigation-update.

specifically the phrase "continuous surface connection" as used in the *Rapanos* and *Sackett* decisions across both currently operative regulatory regimes, we are providing the following direction. This will provide for more effective and efficient approved jurisdictional determinations, permitting actions and other relevant actions consistent with *Sackett*.[3]

In addition, the agencies plan to issue a public notice imminently in the *Federal Register* to establish a docket on "WOTUS Notice: The Final Response to SCOTUS," outlining a process to gather recommendations on the meaning of key terms in *Sackett* to inform future administrative actions that will seek to conform the definition of "waters of the United States" to Supreme Court precedent.

This guidance represents the agencies' views on the proper implementation of the definition of "waters of the United States" and is effective immediately. The EPA and the Department of the Army will apply this guidance when determining if a wetland has a "continuous surface connection" to a requisite jurisdictional water under the Clean Water Act.

**BACKGROUND**

***Sackett* and *Rapanos***

While the U.S. Supreme Court has issued numerous key decisions interpreting the phrase "waters of the United States," the two cases that are of particular importance for purposes of this memorandum, especially as they relate to the "continuous surface connection" requirement for adjacent wetlands, are *Sackett v. Environmental Protection Agency*, 598 U.S. 651 (2023), and *Rapanos v. United States*, 547 U.S. 715 (2006).

On May 25, 2023, the *Sackett* Court "conclude[d] that the *Rapanos* plurality was correct" and rejected Justice Kennedy's "significant nexus" standard, calling it a "particularly implausible" "theory" and stating that "the CWA never mentions the 'significant nexus' test, so the EPA has no statutory basis to impose it." *Sackett*, 598 U.S. at 680. As a result, the agencies can apply only the *Rapanos* plurality standard as informed by *Sackett* in determining when adjacent wetlands are subject to CWA jurisdiction. As explained by the plurality in *Rapanos*, this standard is also consistent with prior Supreme Court precedent interpreting "waters of the United States," including the Court's opinion in *Riverside Bayview*. *See Rapanos*, 547 U.S. at 734-35, 740-42, 746-48 (Scalia, J., plurality).

*Sackett* makes reference to the relationship between adjacent wetlands and covered waters on multiple occasions. The *Sackett* Court clarified that:

> In *Rapanos*, the plurality spelled out clearly when adjacent wetlands are part of covered waters. It explained that "waters" may fairly be read to include only those wetlands that are "as a practical matter indistinguishable from waters of the United States," such that it is "difficult to determine where the 'water' ends and the 'wetland' begins." That occurs when wetlands have "a continuous surface connection to bodies that are 'waters of the United States' in their own

---

[3] The Clean Water Act and the EPA and Corps regulations, interpreted consistent with the *Sackett* decision, contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. Thus, it does not impose legally binding requirements on the EPA, the Corps, Tribes, states or the regulated community.

2

> right, so that there is no clear demarcation between 'waters' and wetlands." . . . We agree with this formulation of when wetlands are part of "the waters of the United States.

*Id*. at 678 (internal citations omitted).

The *Sackett* Court also found that "[w]etlands that are separate from traditional navigable waters cannot be considered part of those waters, even if they are located nearby," *id*. at 678, and that "'adjacent' cannot include wetlands that are not part of covered 'waters,'" *id*. at 682. The Court also recognized that in determining the jurisdictional status of wetlands, the *Riverside Bayview* Court "need[ed] to focus so extensively on the adjacency of wetlands to covered waters" to adhere to the proper interpretation of the Clean Water Act. *Id*. at 674.

This is why the plurality in *Rapanos* rejected the Corps' practice of asserting jurisdiction over wetlands adjacent to features that themselves were not "waters of the United States" in their own right based on a hydrologic connection theory. The *Rapanos* plurality instead concluded:

> [O]nly those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of *Riverside Bayview*, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in *SWANCC* . . . . Thus, establishing that wetlands . . . are covered by the Act requires two findings: first, that the adjacent channel contains a "wate[r] of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Rapanos*, 547 U.S. at 742 (Scalia, J., plurality) (emphasis in original).

Additionally, the plurality said that "adjacent" means "physically abutting," and used "abutting" and "adjacent" interchangeably. *Id*. at 748; see also *id*. at 742 ("*Riverside Bayview* rested upon the inherent ambiguity in defining where water ends and abutting ("adjacent") wetlands begin[.]"). Most importantly, the plurality clarified that "the statutory definition [of 'navigable waters' at 33 U.S.C. §1362(7)] can be read to include *some* wetlands – namely, those that directly 'abut' covered waters." *Id*. at 747, footnote 12 (emphasis in original).

**2008 *Rapanos* Guidance in the Pre-2015 Regulatory Regime**

Following *Rapanos*, on June 6, 2007, the agencies issued joint guidance entitled "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* and *Carabell v. United States*" to address the waters at issue in that decision. The guidance was reissued with minor changes on December 2, 2008, and a review of that guidance reveals how the agencies interpreted the *Rapanos* plurality's "continuous surface connection" construct. "[O]nly those adjacent wetlands that have a continuous surface connection because they directly abut the [relatively permanent] tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature) are considered jurisdictional under the plurality standard." 2008 *Rapanos* Guidance at 7, footnote 29.

3

Additionally, the 2008 *Rapanos* Guidance applies the *Rapanos* plurality's standard to assert jurisdiction over "[w]etlands that directly abut" "[n]on-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)." *Id*. at 1.

The Corps' pre-2015 Jurisdictional Determination Form Instructional Guidebook, which contained instructions to aid field staff in completing the associated Approved Jurisdictional Determination Form prior to *Sackett*, states "[t]he [*Rapanos*] decision provides two new analytical standards for determining whether water bodies that are not traditional navigable waters (TNWs), including wetlands adjacent to those non-TNWs, are subject to CWA jurisdiction: (1) if the water body is relatively permanent, or if the water body is a wetland that directly abuts (e.g., the wetland is not separated from the tributary by uplands, a berm, dike, or similar feature) a relatively permanent water body (RPW), or (2) if a water body, in combination with all wetlands adjacent to that water body, has a significant nexus with TNWs."[4]

With significant nexus having been struck down by the Court in *Sackett*, we are left to determine what the pre-2015 regulatory regime's approach to adjacency looked like without that evaluation. The Corps' pre-2015 regulatory regime provides clarity on this point in the previously used *Rapanos* "Approved Jurisdictional Determination Form," which states, "[a] wetland that is adjacent to but that does not directly abut an RPW requires a significant nexus test."[5] Removing the significant nexus portion from that statement leaves the simple fact that unless a wetland has a continuous surface connection – directly abutting a requisite jurisdictional water – it cannot be determined to be jurisdictional as an adjacent wetland.

**2023 Rule**

On January 18, 2023, the agencies issued the 2023 Rule to revise the definition of "waters of the United States." The preamble to the 2023 Rule included limited guidance on the implementation of "continuous surface connection," and stated:[6]

> Under the relatively permanent standard for adjacent wetlands, wetlands meet the continuous surface connection requirement if they physically abut, or touch, a relatively permanent paragraph (a)(2) impoundment or a jurisdictional tributary when the jurisdictional tributary meets the relatively permanent standard, or if the wetlands are connected to these waters by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert.

The agencies' "discrete features" language is in tension with the pre-2015 regime and *Sackett* and the purpose of this memo is to align the agencies' interpretation of adjacency with *Sackett*.

---

[4] U.S. ARMY CORPS OF ENGINEERS JURISDICTIONAL DETERMINATION FORM INSTRUCTIONAL GUIDEBOOK, 6 (May 30, 2007), available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll11/id/2310.
[5] U.S. ARMY CORPS OF ENGINEERS, APPROVED JURISDICTIONAL DETERMINATION FORM, 2, available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll11/id/2314.
[6] 88 FR 3004, 3090 (Jan. 18, 2023).

**Guidance on Wetlands with a Continuous Surface Connection**

Under either the amended 2023 regulatory definition of "waters of the United States" or the pre-2015 regulatory regime consistent with *Sackett*, the agencies are interpreting "waters of the United States" to include "only those adjacent wetlands that have a continuous surface connection because they directly abut the [requisite jurisdictional water] (e.g., they are not separated by uplands, a berm, dike, or similar feature)." 2008 *Rapanos* Guidance at 7, footnote 29; *see also* 88 FR 3090 (Jan. 18, 2023) ("wetlands meet the continuous surface connection requirement if they physically abut, or touch, a [requisite jurisdictional water]"). Additionally, pursuant to the *Rapanos* plurality, "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' do not implicate the boundary-drawing problem of *Riverside Bayview*," and thus do not have the "necessary connection" to covered waters that triggers CWA jurisdiction. *Rapanos,* 547 U.S. at 742 (Scalia, J., plurality). The plurality was even more clear that the CWA definition of "navigable waters" includes "some wetlands – namely, those that directly 'abut' covered waters." *Id*. at 747, footnote 12 (Scalia, J., plurality) (emphasis in original).

Therefore, an interpretation of "continuous surface connection" which allows for wetlands far removed from and not directly abutting covered waters to be jurisdictional as adjacent wetlands has the potential to violate the direct abutment requirement for "adjacent wetlands" under the plurality's standard and now *Sackett*'s endorsement of that standard.[7] Therefore, any components of guidance or training materials that assumed a discrete feature established a continuous surface connection are rescinded.[8]

In summary, the Supreme Court in *Sackett* provided a clear two-part test for determining CWA jurisdiction over adjacent wetlands. First, the adjacent body of water must be a "water of the United States," which generally means traditional navigable waters, or a relatively permanent body of water connected to a traditional navigable water. Second, the wetland, assuming it satisfies the agencies' longstanding regulatory definition of "wetlands" at 33 C.F.R. 328.3 and 40 C.F.R. 120.2, must have a continuous surface connection to a requisite covered water making it difficult to determine where the water ends and wetland begins. The *Sackett* Court recognized that there may be some instances where that line drawing problem is difficult, such as during periods of drought or low tide or in those

---

[7] The same is true for any reliance on *United States v. Cundiff*, 555 F.3d 200 (6th Cir. 2009) to evaluate wetlands that do not directly abut an otherwise covered water. Such reliance could create conflict with *Sackett*'s two-part test for jurisdiction over adjacent wetlands.

[8] This recission encompasses the relevant portions of the agencies' "September 24, 2024, Presentation: Updates on 'Waters of the United States'" ("[w]etlands also have a continuous surface connection when they are connected to a jurisdictional water by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert…"). *Id*. at slide 47, available at https://www.epa.gov/system/files/documents/2024-09/wotus-overview_9-24-24_508c.pdf, and the agencies' "Presentation – November 15, 2023, Updates for Tribes and States on 'Waters of the United States'" ("[w]etlands also have a continuous surface connection when they are connected to a jurisdictional water by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert…"). *Id*. at slide 48, available at https://www.epa.gov/system/files/documents/2023-11/wotus-overview_tribes-and-states_11-15-23_508.pdf. This directive also serves to rescind the following case-specific memoranda to the Field implementing the pre-2015 regulatory regime consistent with *Sackett* that apply the same "discrete features" test as the two trainings listed herein: "Memorandum on NWK-2022-00809," "Memorandum on SWG-2023-00284," "Memorandum on LRB-2023-00451" and "Memorandum on NWK-2024-00392," as well as the following case-specific memoranda addressing continuous surface connection under the amended 2023 rule: "Memorandum on NWP-2023-602," "Memorandum on NAP-2023-01223," "Memorandum on POH-2023-00187" and "Memorandum on MVR-2023-0828."

instances where there may be temporary interruptions in surface connection. The agencies will work to resolve these scenarios on a case-by-case basis and provide further clarity when appropriate to guide future implementation.

The agencies will use a forthcoming *Federal Register* notice and recommendations docket on "WOTUS Notice: The Final Response to SCOTUS" as well as other stakeholder engagement opportunities to identify areas of implementation challenges to be later addressed either through additional guidance or rulemaking.

**Dated:** March 12, 2025

*[Signature]*

Robyn S. Colosimo, P.E.
Senior Official Performing the Duties of the Assistant Secretary of the Army (Civil Works)
Department of the Army

BENITA BEST-WONG
Digitally signed by BENITA BEST-WONG
Date: 2025.03.12 16:11:05 -04'00'

Benita Best-Wong,
Deputy Assistant Administrator performing the non-exclusive duties and functions
of the Assistant Administrator for Water, U.S. Environmental Protection Agency

# Attachment 2

20. On page 5283, in the second column, in paragraph (g)(1)(i), in the seventeenth line from the bottom of the paragraph, the language ''Subsidary'' is corrected to read ''Subsidiary''.

21. On page 5285, in the first column, in paragraph (g)(6)(ii), in the eleventh line from the bottom of the paragraph, the language ''creditorexchange'' is corrected to read ''creditor exchange''.

22. On page 5285, in the second column, in paragraph (g)(7)(ii), in the eleventh line from the bottom of the paragraph, the language ''creditorexchange'' is corrected to read ''creditor exchange''.

23. On page 5285, in the third column, in paragraph (g)(8)(i)(B), in the fourth line from the bottom of the paragraph, the language ''ending on the distribution date'' is corrected to read ''before its satisfaction with section 361 consideration''.

§ 1.368–4  [Corrected]

■ 24. On page 5289, in the first column, in paragraph (d), in the seventh and eighth lines from the top of the paragraph, the language ''paragraph (d) and paragraph (e) of this'' is removed.

■ 25. On page 5292, in the second column, in paragraph (g)(7)(ii)(B), in the fifth line from the bottom of the page, the language ''assumptionis'' is corrected to read ''assumption is''.

■ 26. On page 5293, in the third column, in paragraph (g)(13)(i), in the seventh line from the bottom of the page, the language ''will transfer'' is corrected to read ''will commit to attempting to transfer''.

■ 27. On page 5294, in the first column, in paragraph (g)(13)(i):

■ i. In the fourth line from the top of the page, the language ''Distributing will distribute'' is corrected to read ''Distributing then will commit to attempting to distribute''.

■ ii. The twelfth and thirteenth lines from the top of the page are corrected to read ''or follow-on spin-off, Distributing then will commit to selling the retained stock on the open''.

■ 28. On page 5294, in the third column, in paragraph (g)(14)(i):

■ i. The second and third sentences are corrected to read ''With regard to the retained stock, the separation and distribution agreement and other official records of Distributing provide that Distributing might either transfer the retained stock to a creditor of Distributing in a stock-for-debt exchange that satisfies the requirements set forth in §§ 1.361–5(a) and 1.368–3(a)(5) (stock-for-debt exchange), or distribute that retained stock to Distributing's shareholders (follow-on spin-off).''.

■ ii. The fifth and fourth lines from the bottom of the page are corrected to read ''or follow-on spin-off, Distributing then will commit to selling the retained stock on the open''.

■ iii. In the line at the bottom of the page, the language ''these'' is corrected to read ''the''.

■ 29. On page 5295, in the first column, in paragraph (g)(14)(i), the second and third lines from the top of the page are corrected to read ''out the stock-for-debt exchange or follow-on spin-off, without committing to either, as well as its written''.

Aron L. Cosby,
*Federal Register Liaison, Publications & Regulations Section, Associate Chief Counsel, (Procedure and Administration).*

[FR Doc. 2025–04757 Filed 3–21–25; 8:45 am]
BILLING CODE 4830–01–P

# DEPARTMENT OF DEFENSE

## Department of the Army, Corps of Engineers

### 33 CFR Part 328

# ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 120

[EPA–HQ–OW–2025–0093; FRL–12683–01–OW]

### WOTUS Notice: The Final Response to SCOTUS; Establishment of a Public Docket; Request for Recommendations

**AGENCY:** Department of the Army, Corps of Engineers, Department of Defense; and Environmental Protection Agency (EPA).

**ACTION:** Notice; announcement of listening sessions and solicitation of stakeholder feedback.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) and the Department of the Army intend to engage with State and Tribal co-regulators; industry and agricultural stakeholders; environmental and conservation stakeholders; and the public on certain key topics related to the implementation of the definition of ''waters of the United States'' in light of the Supreme Court's 2023 decision in *Sackett* v. *Environmental Protection Agency.* The agencies are committed to learning from the past regulatory approaches—the pre-2015 regulations and guidance, the 2015 Clean Water Rule, the 2020 Navigable Waters Protection Rule, the 2023 Rule, and the Amended 2023 Rule—while engaging with stakeholders before taking further administrative action to provide any additional clarification to agency staff, co-regulators, and the public on specific aspects of the definition of ''waters of the United States.''

This notice includes an announcement of forthcoming listening sessions on specific key topic areas to hear interested stakeholders' perspectives on defining ''waters of the United States'' consistent with the Supreme Court's interpretation of the scope of Clean Water Act jurisdiction and how to implement that interpretation as the agencies consider next steps. The agencies are also accepting written recommendations from members of the public via a recommendations docket. These opportunities are intended to provide for broad, transparent engagement with a full spectrum of stakeholders.

**DATES:** Written recommendations must be received on or before April 23, 2025. Please refer to the **SUPPLEMENTARY INFORMATION** section for additional information on the forthcoming listening sessions.

**ADDRESSES:** You may send written feedback, identified by Docket ID No. EPA–HQ–OW–2025–0093, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting written feedback.

• *Email: OW-Docket@epa.gov.* Include Docket ID No. EPA–HQ–OW–2025–0093 in the subject line of the message.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Water Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand Delivery or Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include Docket ID No. EPA–HQ–OW–2025–0093. Written feedback received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on sending written recommendations and additional information on the forthcoming listening sessions, see the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:**
Stacey Jensen, Oceans, Wetlands and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: (202) 564–2281; email address: *WOTUS-outreach@epa.gov,* and Milton Boyd, Office of the Assistant Secretary of the Army for Civil Works, Department of the Army, 108 Army Pentagon, Washington, DC 20310–0104; telephone number: (202) 761–8546; email address: *milton.w.boyd.civ@army.mil.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

The U.S. Environmental Protection Agency (EPA) and the U.S. Department of the Army ("Army"; collectively, "the agencies") understand that farmers, landowners, and developers across the country have concerns and questions about certain key issues related to the definition of "waters of the United States" following the Supreme Court's decision in *Sackett* v. *Environmental Protection Agency,* 598 U.S. 651 (2023) (*Sackett*). The agencies are committed to providing additional clarity regarding which waters are "waters of the United States" under the Federal Water Pollution Control Act, also known as the Clean Water Act. The Trump Administration is going to take a close look at critical aspects of "waters of the United States" and ensure that the definition follows the Supreme Court's *Sackett* decision to provide realistic durability and consistency.

"Waters of the United States" is a threshold term in the Clean Water Act that establishes the geographic scope of federal jurisdiction under the Act.[1] Many Clean Water Act programs, including sections 303 (water quality standards and total maximum daily loads), 311 (oil spill programs), 401 (water quality certifications), 402 (pollutant discharge permits) and 404 (dredged and fill material discharge permits), address "navigable waters," defined in the statute as "the waters of the United States, including the territorial seas." See 33 U.S.C. 1362(7). Since the 1970s, the agencies have defined "waters of the United States" by regulation. On May 25, 2023, the Supreme Court decided *Sackett.* In light of the decision, on September 8, 2023, the EPA and the Army published a final rule to amend the January 2023 definition of "waters of the United States" without notice and comment to conform to the Supreme Court's decision.

The "Amended 2023 Rule" refers to the final rule "Revised Definition of 'Waters of the United States,'" 88 FR 3004 (January 18, 2023) ("2023 Rule") as amended by the rule "Revised Definition of 'Waters of the United States'; Conforming," 88 FR 61964 (September 8, 2023) ("Conforming Rule") (codified at 33 CFR 328.3 (U.S. Army Corps of Engineers) and 40 CFR 120.2 (EPA)) which was issued without notice and comment under the "good cause" exemption to the Administrative Procedure Act. However, due to ongoing litigation,[2] the Amended 2023 Rule is not operative in certain States.[3] In the jurisdictions where the Amended 2023 Rule is subject to a preliminary injunction, the agencies are interpreting "waters of the United States" consistent with the pre-2015 regulatory regime [4] and the Supreme Court's decision in *Sackett,* pursuant to the recent 2025 guidance memorandum released by the agencies.[5]

### II. Implementation of the Definition of "Waters of the United States" Post-Sackett

On March 12, 2025, the EPA and the Army signed a memorandum providing guidance for implementing the "continuous surface connection" requirement and related issues under both regulatory regimes that are currently in effect across the country. In that memorandum, the agencies stated that they planned to issue a public notice in the **Federal Register** and docket on "WOTUS Notice: The Final Response to SCOTUS," outlining a process to gather recommendations on the meaning of key terms in light of *Sackett* to inform any potential future administrative actions to clarify the definition of "waters of the United States" and to ensure transparent, efficient, and predictable implementation. This notice fulfills the commitment provided for in the memorandum.

The agencies have heard numerous concerns raised by stakeholders about the Amended 2023 Rule, including implementation-related issues and issues raised in ongoing litigation challenging the amended regulations. The EPA and the Army have heard concerns that the Amended 2023 Rule does not adequately comply with the *Sackett* decision, especially as it relates to implementation of which features are "connected to" "relatively permanent" waters and to which waters those phrases apply, implementation of the "continuous surface connection" requirement and to which features that phrase applies, and which ditches are properly considered to be "waters of the United States." The agencies intend to use the listening sessions and the recommendations docket to inform any future administrative actions on the definition of "waters of the United States," including learning from States, Tribes, and interested stakeholders about their experiences under the Amended 2023 Rule, the pre-2015 regulatory regime as informed by *Sackett,* and other previous definitions of "waters of the United States" relevant to the *Sackett* decision. The agencies' administrative actions will be consistent with the Clean Water Act and relevant Supreme Court decisions.[6] Going

---

[1] Note that Section 301(a) of the Clean Water Act prohibits unauthorized discharges "of any pollutant by any person," to "navigable waters," defined as "the waters of the United States, including the territorial seas." See 33 U.S.C. 1311(a), 1362(7), (12).

[2] Multiple States and industry associations, as well as one individual, have filed complaints challenging the Amended 2023 Rule in four different district courts. *Texas* v. *EPA,* Nos. 23–00017 & 23–00020 (S.D. Tex.); *West Virginia* v. *EPA,* No. 23–00032 (D.N.D.); *Kentucky* v. *EPA,* No. 23–00007 (E.D. Ky.); *White* v. *EPA,* No. 24–00013 (E.D.N.C.).

[3] For more information about the operative definition of "waters of the United States" for specific geographic areas in light of litigation, please visit *https://www.epa.gov/wotus/definition-waters-united-states-rule-status-and-litigation-update.*

[4] The "pre-2015 regulatory regime" refers to the agencies' pre-2015 definition of "waters of the United States," implemented consistent with relevant case law and longstanding practice, as informed by applicable guidance, training, and experience, consistent with *Sackett*.

[5] Memorandum to the Field between the U.S. Department of the Army, U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency Concerning the Proper Implementation of "Continuous Surface Connection" under the Definition of "Waters of the United States" under the Clean Water Act (Mar. 12, 2025), *https://www.epa.gov/wotus/current-implementation-waters-united-states.*

[6] In *United States* v. *Riverside Bayview Homes,* 474 U.S. 121 (1985), the Supreme Court deferred to the Corps' judgment and upheld the inclusion of adjacent wetlands in the regulatory definition of "waters of the United States." In *Solid Waste Agency of Northern Cook County* v. *U.S. Army Corps of Engineers,* 531 U.S. 159 (2001), the Court held that the use of "isolated" non-navigable intrastate ponds by migratory birds was not by itself a sufficient basis for the exercise of Federal regulatory authority under the CWA. In *Rapanos* v. *United States,* 547 U.S. 715 (2006), a four-Justice plurality interpreted "waters of the United States" as covering "relatively permanent" waters as well as wetlands with a "continuous surface connection" to such water bodies. Justice Kennedy's concurring opinion concluded that a water or wetland must possess a "significant nexus" to traditional navigable waters to be a "water of the United States." In *Sackett,* the Supreme Court "conclude[d] that the *Rapanos* plurality was correct" and rejected Justice Kennedy's "significant nexus" standard, calling it a "particularly implausible" "theory" and stating that "the CWA never mentions the 'significant

Continued

forward, the agencies' will seek to provide clear and transparent direction regarding the definition and will prioritize practical implementation approaches, provide for durability and stability, as well as for more effective and efficient jurisdictional determinations, permitting actions, and other actions consistent with relevant decisions of the Supreme Court. Any actions will reflect consideration of the experiences of, and input received from, landowners, industry groups, the agricultural community, States, Tribes, local governments, community organizations, environmental groups, and the general public.

### III. Stakeholder Feedback Opportunities

To assist the agencies in further clarifying the definition of ''waters of the United States,'' the agencies welcome feedback on specific key topic areas that can be provided by participating in one of several listening sessions or by submitting written recommendations through the open public docket. This feedback will inform any future administrative actions; however, the agencies will not be providing a specific written response to individual submissions and recommendations. When providing feedback, it will be helpful to the agencies if information is provided to support input on the particular issues described below, such as statutory citations, case law, references to longstanding agency practice, etc. The agencies are seeking input on the following issues:

- *The scope of ''relatively permanent'' waters and to what features this phrase applies.* The agencies have used a wide variety of descriptive terminology and criteria for determining which tributaries are ''waters of the United States'' under multiple regulatory regimes and rules. However, in light of the *Sackett* decision, only ''relatively permanent'' tributaries may be subject to Clean Water Act jurisdiction. Under the pre-2015 regulatory regime, ''relatively permanent'' tributaries are those that typically flow year-round or that have continuous flow at least seasonally (*e.g.,* typically three months). Ephemeral streams were categorically excluded from jurisdiction in the 2020 Navigable Waters Protection Rule (NWPR), and only those perennial and intermittent tributaries that contributed flow downstream in a typical year to a traditional navigable water or the territorial seas were considered jurisdictional. Under the interpretation provided in the preamble to the 2023 Rule, relatively permanent tributaries are those tributaries with flowing or standing water year-round or continuously during certain times of the year and more than just a short duration in direct response to precipitation.

- The agencies seek feedback on whether certain characteristics, such as flow regime, flow duration, or seasonality should inform a definition of ''relatively permanent'' as well as to which features this phrase should apply to in light of *Sackett* and in consideration of the agencies' objectives described in this document.

- The agencies are particularly interested in feedback regarding how to identify ''relatively permanent'' tributaries in the field to assist with transparent, efficient, and predictable implementation.

- *The scope of ''continuous surface connection'' and to which features this phrase applies.* Each regulatory definition of and regulatory regime for ''waters of the United States'' has taken a different approach to determining adjacency for purposes of assessing jurisdiction over ''adjacent'' wetlands under the Act and for assessing the jurisdiction of certain intrastate, non-navigable waters that do not meet the definition of ''waters of the United States'' under other jurisdictional categories (*e.g.,* relatively permanent lakes and ponds assessed under paragraph (a)(5) of the Amended 2023 Rule and waters assessed under the comparable paragraph (a)(3) of the pre-2015 regulations). In *Sackett,* the Supreme Court held that ''adjacent'' wetlands are those that have a ''continuous surface connection'' to a requisite jurisdictional water.[7] Under the 2020 NWPR, which relied heavily on the plurality standard in *Rapanos* v. *United States,* 547 U.S. 715 (2006), adjacent wetlands and jurisdictional lakes, ponds, and impoundments included those that abutted traditional navigable waters, the territorial seas, tributaries, or lakes, ponds, or jurisdictional impoundments; those with certain surface water connections; and those physically separated from a jurisdictional water only by a natural berm, bank, dune, or similar natural feature. Under the pre-2015 regulatory regime as informed by *Sackett,* the agencies are interpreting ''waters of the United States'' to include ''only those adjacent wetlands that have a continuous surface connection because they directly abut the [requisite jurisdictional water] (*e.g.,* they are not separated by uplands, a berm, dike, or similar feature).''[8]

The preamble to the 2023 Rule states that wetlands and relatively permanent lakes and ponds meet the continuous surface connection requirement if they physically abut or touch a requisite jurisdictional water; if they are connected to a requisite jurisdictional water by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert; or if they are behind a natural berm or similar natural landform where that natural landform provides evidence of a continuous surface connection. However, the agencies recently rescinded any components of agency interpretation, guidance, or training materials that assumed a discrete feature established a continuous surface connection to align the agencies' implementation with the pre-2015 regime and *Sackett*.[9] Currently, under both the pre-2015 and Amended 2023 Rule regulatory regimes that are currently operative across the country, the agencies are implementing ''continuous surface connection'' to mean abutting (or touching).

- The agencies seek feedback on defining ''continuous surface connection,'' including what it means to ''abut'' a jurisdictional water; if it includes wetlands behind a natural berm or similar natural landforms to the extent the natural landforms provide evidence of a continuous surface connection; and whether certain features, such as flood or tide gates, pumps, or similar artificial features do or do not remove a wetland from being considered ''adjacent'' to the jurisdictional water on the other side of the feature.

- The agencies specifically seek feedback on the scope of ''connection to'' as well as to which features this phrase applies, to describe wetlands as adjacent to relatively permanent waters when they have a continuous surface ''connection to'' those waters.

- The agencies also specifically seek feedback on the interpretation and implementation of the language in

---

nexus' test, so the EPA has no statutory basis to impose it.'' *Sackett,* 598 U.S. at 680.

[7] 598 U.S. at 684.

[8] *See* U.S. EPA & U.S. Army Corps of Engineers, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos* v. *United States & Carabell* v. *United States* (June 5, 2007), superseded December 2, 2008 (the ''*Rapanos* Guidance'') at 7, footnote 29.

[9] Memorandum to the Field between the U.S. Department of the Army, U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency Concerning the Proper Implementation of ''Continuous Surface Connection'' under the Definition of ''Waters of the United States'' under the Clean Water Act (Mar. 12, 2025), *https://www.epa.gov/wotus/current-implementation-waters-united-states.*

*Sackett* providing that "temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells." [10]

- Under the Amended 2023 Rule, the agencies have defined adjacent as "having a continuous surface connection" and the continuous surface connection requirement applies to both adjacent wetlands and relatively permanent lakes and ponds assessed under paragraph (a)(5). The agencies seek input on the definition of "adjacent" as well as which are the appropriate categories to properly assess using the continuous surface connection requirement.
- The agencies are interested in developing an approach for continuous surface connection that provides for clarity and implementability, including whether there are factors to limit continuous surface connection and whether there are certain characteristics that could provide clear distinctions to meet the continuous surface connection requirement. The agencies are also interested in recommendations for implementation approaches to address continuous surface connection.
- *The scope of jurisdictional ditches.* In practice, different types of ditches have generally been considered non-jurisdictional in different regulatory regimes. The 2015 Clean Water Rule, the 2020 NWPR, and the Amended 2023 Rule excluded certain types of ditches explicitly in rule language. Currently, ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water are considered to be generally non-jurisdictional under the pre-2015 regulatory regime, while similarly, ditches (including roadside ditches) excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water are excluded by rule in the Amended 2023 Rule.
- The agencies solicit feedback on whether flow regime (*e.g.,* relatively permanent status or perennial or intermittent flow regimes), physical features, excavation in aquatic resources versus uplands, type or use of the ditch (*e.g.,* irrigation and drainage), biological indicators like presence of fish, or other characteristics could provide clear and implementable distinctions between jurisdictional and non-jurisdictional ditches.
- The agencies also seek input on whether a definition of ditch, as was provided in the 2020 NWPR, which defined ditch to mean a constructed or excavated channel used to convey water,[11] would provide additional clarity.

### IV. Public Listening Sessions

The agencies will hold a series of listening sessions intended to solicit recommendations as the agencies seek to pursue further administrative action. During these sessions, the agencies intend to present brief background information and provide an opportunity for stakeholders to share input, with regard to the topics above. The agencies will hold at least six listening sessions, with two open to all stakeholders, one open to States, one open to Tribes, one open to industry and agricultural stakeholders, and one open to environmental and conservational stakeholders.

The listening sessions will be held as web and in-person conferences in April-May 2025. Registration instructions and dates will be forthcoming at the following website: *https://www.epa.gov/wotus/public-outreach-and-stakeholder-engagement-activities.* Persons or organizations wishing to provide verbal recommendations during the listening sessions will be selected on a first-come, first-serve basis. Due to the expected number of participants, individuals will be asked to limit their spoken presentation to three minutes. Once the speaking slots are filled, participants may be placed on a standby list to speak or continue to register to listen to the recommendations. The listening sessions will be recorded and posted on EPA's website. Supporting materials and written feedback from those who do not have an opportunity to speak can be submitted to the docket as described above.

**Robyn S. Colosimo,**
*Senior Official Performing the Duties of the Assistant Secretary of the Army (Civil Works), Department of the Army.*

**Benita Best-Wong,**
*Deputy Assistant Administrator for Management, Office of Water, Environmental Protection Agency.*

[FR Doc. 2025–04649 Filed 3–21–25; 8:45 am]
**BILLING CODE 6560–50–P**

---

[10] 598 U.S. at 678.

[11] 85 FR 22250, 22338 (Apr. 21, 2020).

---

# ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

[EPA–R10–OAR–2024–0595; FRL–12391–05–R10]

## Air Plan Approval; AK, Fairbanks North Star Borough; 2006 24-Hour PM$_{2.5}$ Serious Area and 189(d) Plan

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; reopening of comment period.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is reopening the public comment period on the proposed rule entitled "Air Plan Approval; AK, Fairbanks North Star Borough; 2006 24-hour PM$_{2.5}$ Serious Area and 189(d) Plan" published on January 8, 2025. Commenters requested more time to review the proposal and prepare comments. In response, the EPA is providing an additional 30 days for the public to provide comment on all aspects of the proposed rule. The January 8, 2025, notice of proposed rulemaking also started the EPA's adequacy process for the motor vehicle emissions budgets and began the public comment period for that process. The EPA is not reopening the public comment period for the adequacy process, and it intends to proceed with the adequacy process outside of this rulemaking.

**DATES:** The comment period for the proposed rule published on January 8, 2025, at 90 FR 1600, is reopened to allow more time to review the proposal and prepare comments. The EPA is reopening the comment period and the comments must be received on or before April 23, 2025.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R10–OAR–2024–0595, at *https://www.regulations.gov.* Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information the disclosure of which is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment